UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MASAHIRO NAKAHATA,

*on behalf of herself and all other employees similarly situated,*

　　　　　　　　　　　　　　　　　　　*Plaintiffs,*

　　　　　　v.

NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, INC., NEW YORK-PRESBYTERIAN FUND, INC., NEW YORK-PRESBYTERIAN HOSPITAL, THE BROOKLYN HOSPITAL CENTER, HOLY NAME HOSPITAL, INC. OR HOLY NAME MEDICAL CENTER, LAWRENCE HOSPITAL CENTER, MARY IMOGENE BASSETT onal Care NEW MILFORD HOSPITAL, INC., THE THE NEW YORK COMMUNITY HOSPITAL OF BROOKLYN, INC., NEW YORK DOWNTOWN HOSPITAL, THE NEW YORK HOSPITAL MEDICAL CENTER OF QUEENS, THE NEW YORK METHODIST HOSPITAL, WESTCHESTER SQUARE MEDICAL CENTER, INC., NYACK HOSPITAL, PALISADES MEDICAL CENTER, STAMFORD HOSPITAL, THE VALLEY HOSPITAL, WHITE PLAINS MEDICAL CENTER, WINTHROP-UNIVERSITY HOSPITAL, WYCKOFF HEIGHTS MEDICAL CENTER, ST. MARY'S HEALTHCARE SYSTEM FOR CHILDREN, INC., HERBERT PARDES, AND SOLOMON A. TORRES,

　　　　　　　　　　　　　　　　　　　*Defendants.*

COMPLAINT- CLASS ACTION
AND DEMAND FOR JURY TRIAL

Civil Action No. _10-CV-2661_

## NATURE OF CLAIM

　　1.　　This is a proceeding for injunctive and declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiff, Masahiro Nakahata, individually, as well as all other employees similarly situated ("Class Members"), under the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.* and under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory Judgment Statute, 28 U.S.C. § 2201; under 29 U.S.C. § 216(b); and under 18 U.S.C. § 1964(a) and (c).

3.     Venue is appropriate in the Southern District of New York since the allegations arose in this district, Plaintiff resides in this district, and defendants reside in this district.

## CLASS ACTION ALLEGATIONS

4.     The claims arising under RICO are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

5.     The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b).

6.     The class consists of current and former employees of defendants who were injured by defendants' scheme to cheat employees out of their property and to convert the employees' property, including their wages and/or overtime pay, by misleading employees about their rights under the FLSA.

7.     The class size is believed to be over 52,000 employees.

8.     The Plaintiff will adequately represent the interests of the Class Members because they are similarly situated to the Class Members and their claims are typical of, and

concurrent to, the claims of the other Class Members.

9. There are no known conflicts of interest between the Plaintiff and the other Class Members.

10. The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Plaintiffs' and Class Members' claims.

11. The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under federal wage and hour laws.

12. Common questions of law and fact predominate in this action because the claims of Plaintiff and Class Members are based on whether defendants' policies and practices of not properly paying employees for all hours worked is a part of a scheme to defraud Plaintiffs in violation of RICO.

13. The class action is maintainable under subsections (2) and (3) of Rule 23(b) because the Plaintiff and Class Members seek injunctive relief, common questions of law and fact predominate among the Plaintiff and Class Members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

PARTIES

A.    **Defendants**

14. Collectively, defendants New York-Presbyterian Healthcare System, Inc., New York-Presbyterian Fund, Inc., the Brooklyn Hospital Center, Holy Name Hospital Inc. (also known as Holy Name Medical Center), Lawrence Hospital Center, Mary Imogene Bassett Hospital, New Milford Hospital, Inc., the New York Community Hospital of Brooklyn, Inc., New York Downtown Hospital, the New York Hospital Medical Center of Queens, the New

-3-

York Methodist Hospital, Westchester Square Medical Center, Inc., Nyack Hospital, Palisades Medical Center, Stamford Hospital, The Valley Hospital, White Plains Medical Center, Winthrop-University Hospital, Wyckoff Heights Medical Center, St. Mary's Healthcare System for Children, Inc., Herbert Pardes and Solomon A. Torres (collectively, "Named Defendants") are related organizations through, for example, common membership, governing bodies, and trustees and/or officers.

15.    Named Defendants' health care facilities and centers include the following: Center for Aging Research and Clinical Care, Center for Lymphoma and Myeloma, Center for the Study of Hepatitis C, Epilepsy Center, Headache Center, Multiple Sclerosis Center, Neuromuscular Center, Sleep Medicine Center, Phyllis and David Komansky Center for Children's Health, Sackler Institute for Developmental Psychobiology, Center for Reproductive Medicine and Infertility (CRMI), Breast Center, Burn Center, Brady Urologic Center, Center for Complementary and Integrative Medicine, Institute for Computational Biomedicine, Center for Male Reproductive Medicine and Microsurgery, the Center for Special Studies, William Randolph Hearst Burn Center, Jay Monahan Center for Gastrointestinal Health, Minimal Access Surgery Center of New York-Presbyterian Hospital, Vascular Care Center, Bariatric Surgery Center at New York-Presbyterian/Weill Cornell, Medical Center, Iris Cantor Women's Health Center, Irving Sherwood Wright Center on Aging, the Center for Women's Health at New York-Presbyterian/Columbia Eastside, New York Weill Medical Center Fund, Inc., Payne Whitney Clinic, New York College of Podiatric Medicine & Foot Clinics of New York, New York-Presbyterian Hospital/Weill Cornell Clinic Research Center(CRC), the Brooklyn Hospital Center Ambulatory (Outpatient) Care Center, Brooklyn Hospital 8th Avenue Family Health Center, La Providencia Family Medicine

Center, Manhattan Avenue Health Center, Williamsburg Family Health Center, PATH Center, Caledonian Health Center, the Birth Place, Regional Cancer Center, the Center for Healthy Living, the Institute for Clinical Research, NHN Fitness, Northern New Jersey Center for Sleep Medicine, the Interventional Institute at Holy Name Medical Center, Bernard W. Gimbel Multiple Sclerosis Comprehensive Care Center at Holy Name Hospital, Villa Marie Claire Hospice, Institute for Cartilage Repair, Children and Adolescent Hand and Arm (cHArm) Center, Foster Center for Clinical Outcome Research, Computer Assisted (CAS) Surgery, Center for Hip Pain and Preservation, Gosden Robinson Inflammatory Arthritis Center, Integrative Care Center, Institute for Limb Lengthening and Complex Reconstruction, Mary Kirkland Center for Lupus Care, Mary Kirkland Center for Lupus Research, Muscoskeletal Magnetic Resonance Imaging Center, Osteoporosis Prevention Center, the Kathryn O. and Alan C. Greenberg Center for Skeletal Dysplasias, Barbara Volcker Center for Women and Rheumatic Disease, Women's Sports Medicine Center, Lawrence Hospital Center Patient Service Center, Bassett Heart Care Institute, Bassett Cancer Institute, Regional Cancer Center, Family Birthing Center, One-Day Surgery Center, Regional Heart Center, The Center for Sleep Medicine, Downtown Family Care Center (DFCC), Center for Female Continence and Pelvic Health, The Joint Reconstruction Center, the Vein Center, Wound Care Center, Ambulatory Care Center, Julia and Ned Arnold Center for Radiation Oncology, Breast Center, Cardiac Health Center, Center for Dental and Oral Medicine, Center for Developmental Disabilities, Family Health Center, HealthOutreach, Hollis Women's Center, Jackson Heights Family Health Center, Neuroscience Institute, OB/GYN Ambulatory Care Center, Pediatric Asthma Center, Queens Eye Center, Silvercrest Center for Nursing and Rehabilitation, Specialty Care Center,  Theresa Lang Children's

Ambulatory Center, Trude Weishaupt Memorial Satellite Dialysis Center, the Center or Digestive Diseases and Swallowing Disorders, NYM Family Health Center, NYM Medical Associates, Advanced Women's Imaging and Prenatal Testing Center, Sleep Disorders Center, Spine and Arthritis Center, Institute for Asthma and Lung Disease, Institute for Cancer Care, Institute for Cardiology and Cardiac Surgery, Institute for Diabetes and Other Endocrine Disorders, Institute for Digestive Disorders and Liver Disorders, Institute for Neurosciences, Institute for Orthopedic Surgery and Medicine, Institute for Vascular Medicine and Surgery, Institute for Women's Health, the Breast Institute, Cancer Treatment and Wellness Center, Institute for Neurosciences, the Ken Hamilton Caregivers Center, the Balance Center, the Center for Diabetes, the Center for Sleep Medicine, Stroke Center, Women's Imaging Center, the Center for Maternal/Child Health, the Breast Center, Edythe Jurz Center for Sleep Medicine, Nyack Hospital Home Care, the Joint Replacement Center, Stroke Center, Union State Bank Cancer Center, Wound Care Center, Inc., the Birthing Center, Palisades Physical Therapy and Sports Medicine Center, the Sleep Wake Center, the Continence Center, Palisades Health Care Holdings, Palisades Radiology Group PA, Palisades Sports and Fitness Center, the Harborage, the Carl and Dorothy Bennett Cancer Center, Children's Specialty Center, Cyberknife Center, Center for Integrative Medicine and Wellness, Center for Robotic Surgery, Diabetes and Endocrine System Treatment Center, the Endoscopy Center at Tully Health Center, the Sleep Center, Tully Health Center, Stamford Vaccine Center, Women's Breast Center, Wound Care Center, the Heart and Vascular Institute, the Orthopedic Institute, Richard L. Rosenthal Hospice Residence, The Valley Columbia Heart Center, the Center for Childbirth, the Center for Sleep Medicine, the Center for Bariatric Surgery, The Valley Hospital Fertility Center, the Breast Center, the Daniel and

Gloria Blumenthal Cancer Center, George R. Jacqua Same Day Services Center, Valley Home Care Inc., Valley Health Medical Group, the Ruth and Jerome A. Siegel Stroke Center, the Westchester Orthopedic Institute, the William & Sylvia Silberstein Neonatal and Maternity Program, the Dickstein Cancer Treatment Center, Anxiety and Phobia Treatment Center, Bariatric Surgery Center, Blood Donor Center, Diabetes Education and Treatment Center, Family Health Center, Multiple Sclerosis (MS) Care Center, Seizure Diagnostic Center, Westchester Orthopaedic Institute (WOI), WPHC Physical Therapy Center, the Sleep Center, the Flanzer Center for Emergencies and Critical Care, Maxine and John Bendheim Family Intermediate Care Center, Kylie and Louis R. Cappelli Pediatric Emergency Center, Women's Imaging Center, the Ambulatory Surgery Center, the Ambulatory Surgery Unit, Bariatric Surgery Center of Excellence, Cancer Center for KIDS, Cardiac Rehabilitation Program (CRP), Child Life Program (CLP), CyberKnife Center, Diabetes Education Center (DEC), Diabetes Program (DP), Dialysis Center (DC), Endoscopic Ultrasound Center (EUSC), Gastrointestinal Diagnostic Motility Center (GDMC), Healthy KIDS Program, Heart Institute (HI), Home Health Agency (HHA), Human Genetics Center (HGC), Hypertrophic Cardiomyopathy Center, International Adoption Medical Consultation Services (IAMCS), Joint Replacement, Kidney Center (KC), Liver, Biliary and Pancreatic Diseases Center (LBPC), Long Island Regional Poison and Drug Information Center, Long Term Home Health Care Program (LTHHCP), Lung Cancer Center (LCC), Lung Center (LC), New Life Center (NLC), Orthopaedics, Osteoporosis Diagnosis, Treatment and Research Center, Pain Management Center, Pediatric Diabetes Center, Pediatric Specialty Center, Pulmonary Rehabilitation Program (PRP), Rheumatoid Arthritis Center, Sleep Disorders Center (SDC), Sports Medicine Center, Trauma Center, Travel Center, Vascular

Disease Program (VDP), Weight Loss and Wellness for Adults and Children, Wound Healing Center and Hyperbaric Medicine Program, Institute for Cancer Care, Institute for Digestive Disorders, Institute for Family Care, Institute for Heart Care, Institute for Lung Care, Institute for Neurosciences, Institute for Specialty Care, the McCann Endoscopy Center, Phyllis & Nathan J. Mistretta Emergency Diagnostic Imaging Center, Outpatient Radiation Oncology Center, Winthrop Dialysis Center at Sunharbor, Winthrop University Hospital Dialysis Center Bethpage, Winthrop Imaging Center, Winthrop Cardiac Rehab Clinic/Pat Clinic, Winthrop School Based Health Clinic, Endrocrine Center, Osteoporosis Center, Diabetes Care Center, the Center for Advanced Wound Care and Hyberbaric Medicine, St. Nicholas ObGyn Associates, P.C., Anthony L. LaMarca Family Health Care Center, Lyndon Baines Johnson Health Complex, Inc., Intercounty Obstetrics & Gynecology, Amsterdam Adult Day Health Care, Amsterdam at Harborside Continuing Care Retirement Community, St. Mary's Kids at Roslyn, St. Mary's Medical Day Care Program at Bayside, St. Mary's Home Care Programs, St. Mary's Community Care Professionals Corp., Center for Rehabilitation Technology (CRT), Prosthetic Orthotic Center, Transitional Rehabilitation Center, Wellness Center, The Osteoporosis Center, Outpatient Rehabilitation Center, Helen B. Atkinson Health Center, Community League Health Center, Downtown Health Center, CABS Health Center, Caribbean House Health Center, Dr. Betty Shabazz Health Center, Red Hook Health Center, Bronx Health Center, Queens Health Center, Susan R. Knafel Polycystic Kidney Disease Center, the Rogosin Institute Ralph J. Bunche Dialysis and Apheresis Center, Rogosin Kidney Center, Manhattan Dialysis Center, Queens Dialysis Center, Brooklyn Dialysis Center, Maurice R. Greenberg Comprehensive Lipid Control Center, Helen Hayes Hospital, Rogosin Institute, Inc., the New York Gracie Square Hospital,

Inc., Northern Westchester Hospital, Hospital for Special Surgery and David D. Thompson Transplantation Center (collectively "Health Centers").

16.    Named Defendants affiliated health care facilities and centers include the following: The New York-Presbyterian Healthcare Network, Inc., The New York-Presbyterian Healthcare Network and Columbia-Cornell Care Consulting and Management Services, LLC, New York Weill Cornell Medical Center Fund, Inc., Community Healthcare Network, New York-Presbyterian Global, Inc., New York-Presbyterian Global Services, Inc., New York-Presbyterian System Select Health, LLC, New York-Presbyterian Foundation, Inc., Weill Cornell Imaging at New York-Presbyterian, Royal Charter Properties-Westchester, Inc., Silvercrest Center for Nursing and Rehabilitation, Royal Charter Properties, Inc., Royal Charter Properties-East, Inc., Royal Charter Properties-First Avenue, Inc., RCP-East, LLC, Network Recovery Services, Inc., Columbia University-Presbyterian Hospital School of Nursing Alumni, Inc., Brooklyn Hospital ECG Medical Services, P.C., Brooklyn Hospital Radiology, P.C., Brooklyn Hospital Nuclear Medicine, P.C., the Brooklyn Hospital Center IPA, Inc., the Brooklyn Hospital Foundation, Inc., DeKalb OB\GYN P.L.L.C., TBHC Anesthesiology Services, P.C., TBHC Dental Services, P.C., TBHC Emergency Medicine, P.C., TBHC Medical Testing Services, P.C., TBHC Medical Services, P.C., TBHC Pediatric Services, P.C., TBHC Physician Services, P.C., TBHC Radiation Oncology, P.C., the Brooklyn Hospital Center Affiliated Employers 401(k) Savings Plan, Bergen Anesthesia Associates, Holy Name Hospital Credit Federal Credit Union, The Hospital for Special Surgery Fund, Inc., New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery, Hospital for Special Surgery Pho, Inc., Robert Hotchkiss, M.D., P.C., New York Spine and Sports Physicians, P.C., HSS Ventures, Inc.,

HSS Horizons, Inc., Erlina L. Lobrin Farcon, M.D., P.C., HSS Properties Corporation, MIAC, Ltd., Lawrence Home Care of Westchester, Jansen Hospice and Palliative Care, The Bereavement Center of Westchester, Women's Imaging Center, Maternity Center, Lawrence Physician Hospital Organization, Inc., Lawrence Community Health Services, Lawrence Medical Associates, P.C., Lawrence Medical Staff, Inc., Lawrence Hospital Fund, Inc., Friends of Bassett, Inc., Thurston Corporation, Home Care Supply Services, Inc., New Milford Visiting Nurse, Inc., New Milford Surgical Associates, P.C., New Milford Spine and Orthopedic Institute, P.C., New Milford Orthopedic Associates, P.C., New Milford Medical Group Properties, LLC, New Milford Medical Group LLC, New Milford Hospital Foundation, Inc, New Milford Hospital Auxiliary, Inc., New Milford Gastroenterology Associates, P.C., Midwood Family Doctor, PLLC, Midwood Physical Therapy, P.C., The New York Community Hospital Ambulance Corp., Brooklyn Bridge Medical Associates, PLLC, Brooklyn Community Medical, P.C., Brooklyn Medical Practice, P.C., Brooklyn Medical Scanning, P.C., New York Downtown Medical Associates, Inc., NYDH Holdings, LLC, NYDH Management Services Corp., OB/GYN Department Educational Activity Fund of the New York Infirmary Hospital, Inc., Booth Medical Associates, P.C., Brooklyn Radiology Services, P.C., Charter Diagnostics Laboratories, Inc., Queens Charter Properties, The Surgical Society of the New York Hospital – Medical Center of Queens, Inc., N.Y. Queens OB/GYN, P.C., Queens OB/GYN P.C., Park Slope Hematology and Oncology, P.C., Park Slope Obstetrics & Gynecology, P.C., Park Slope Cardiac & Rehabilitation Services, P.C., Park Slope Chiropractic, P.C., Park Slope Emergency Physician Service, P.C., Park Slope Imaging, LLC, Park Slope Medical Health Provider, P.C., Park Slope Medical Service, P.C., Park Slope Medicine, P.C., Park Slope Pathology Services, P.C., Park Slope Pediatric

Medicine, P.C., Park Slope Physician Services, P.C., Methodist Hospital Physicians Organization, Inc., New York Methodist Hospital Auxiliary, Westchester Square Imaging Associates, P.C., Westchester Square Physical Therapy, P.C., Westchester Square Physician-Hospital Organization, P.C., NYWSMC Funding Manager, Inc., NYWSMC Funding, LLC, Pediatric Associates of Northern Westchester, L.L.P., Northern Westchester Anesthesia Services, P.C., Northern Westchester Cardiac Rehabilitation, P.C., Northern Westchester Cardiology Associates, P.C., Northern Westchester Dermatology, P.C., Northern Westchester Endoscopy Services, PLLC, Northern Westchester Health Organization, Northern Westchester Hospital Association, Northern Westchester Hospital Center Foundation, Inc., Northern Westchester Hospital Staff Housing Corp., Northern Westchester Internal Medicine, P.C., Northern Westchester OB/GYN Associates, PLLC, Northern Westchester Oncology Management Associates, Inc., Northern Westchester Ophthalmology, P.C., Northern Westchester Orthopaedic Associates, LLP, Northern Westchester Physical and Occupational Services, PLLC, Northern Westchester Physical Medicine, P.C., Northern Westchester Plastic Surgery, P.C., Northern Westchester Psychological Services, P.C., Northern Westchester Surgical Associates, LLP, David M. Crowe, M.D., P.C., Nyack Hospital Foundation, Inc., The Medical- Dental Staff of Nyack Hospital, Inc., Nyack Integrated Medical Services, P.C., Nyack Pediatric Associates, LLP, Nyack Pediatric Dentistry, P.C., Nyack Emergency Physician, P.C., Nyack Foundation for Health Care, Inc., Nyack Health, LLC, Nyack Orthopedics and Sports Medicine, Nyack Pediatric Associates, LLP, Nyack Pediatric Dentistry, P.C., Rockland Critical Care Medical Associates, P.C., Rockland Endocrinology, P.C., Rockland Cardiology Care, P.C., Rockland Cardiology, P.C., Rockland Ear Nose & Throat Specialist Associates, P.C., Rockland Endocrine and Diabetes

Services, P.C., Rockland Infectious Disease LLP, Rockland Medical, P.C., Rockland Neurological Associates, P.C., Rockland Pulmonary and Medical Associates, P.C., Palisades Child Care Center, Inc., Palisades Radiology Group, P.A., Palisades Health Care Holdings, Inc., Continuing Care Retirement Community of Greater Stamford, Stamford OB/GYN Associates, P.C., Fairfield County Surgical Associates, P.C., Fairfield County Primary Care, P.C., Fairfield Obstetrics & Gynecology, Center for Continuing Care of Greater Stamford, Stamford Health System, Inc., Internal Medicine of Stamford, P.C., Medical Associates of Stamford, P.C., Neurological Surgeons of Stamford, P.C., Obstetrics and Gynecology Associates of Stamford, P.C., Pulmonary Associates of Stamford, P.C., Stamford Anesthesia Associates, P.C., Stamford Anesthesiology Services, P.C., Stamford Eye Surgery Center, LLC, Stamford Family Chiropractic Center, LLC, Stamford Health Associates, Inc., Stamford Health System, Inc., Stamford Infectious Diseases, LLC, Stamford Internal Medicine, P.C., Advanced Physical Therapy Center of Stamford, LLC, Endocrinology Center of Stamford, LLC, Family Medicine Associates of Stamford, LLC, Medical and Physical Rehabilitation of Stamford, P.C., Stamford IPA Physicians, Inc., Stamford OB/GYN Associates, P.C., Stamford Oral and Maxillofacial Surgery Associates, P.C., Stamford Pathology Group, P.C., Stamford Pediatric Associates, P.C., Stamford Psychiatry and Geriatric Psychiatry Association, Inc., Stamford Radiological Associates, P.C., Valley Medical Services, Inc., Hospital Gift Shop Auxilliary Valley Hospital, Inc., Society of The Valley Hospital Inc., The Valley Hospital Foundation, Valley Physician Services Inc., Valley Ridge Orthopaedic Associates, P.A., Valley Radiation Oncology Associates, P.A., Valley Nursing Home Corp., Valley Medical Services Inc., Valley Physician Services Inc., Valley Health Medical Group Inc., Valley Medical Associates PA (Inc), Valley Home & Community Health Care Inc, Valley Diagnostic Medical

Center P.A., White Plains Cardiology and Neurology Associates, P.C., White Plains Dermatology Associates, P.C., White Plains Eye Care, P.C., White Plains Family Dental Office, P.C., White Plains Hospital Center Foundation, Inc., White Plains Hospital Medical Center, HIFU Ultra Sound of Westchester, PLLC, Caring Pediatrics of White Plains, P.C., Rye Brook Imaging Center, Winthrop-University Hospital Services, Corp., Winthrop University Hospital Association, Winthrop Cardiology Associates, P.C., Winthrop Cardiovascular And Thoracic Surgery, P.C., Winthrop Child Neurology Associates, P.C., Winthrop Gastroenterology, P.C., Winthrop Hyberbaric & Wound Care Services, P.C., Winthrop Internal Medicine Associates, P.C., Winthrop MS IPA 1, Inc., Winthrop Nephrology Associates, P.C., Winthrop Oncology/Hematology Associates, P.C., Winthrop Orthopaedic Associates, P.C., Winthrop Pathology Services, P.C.. Winthrop Pediatric Associates, P.C., Winthrop Physical Therapy, PLLC, Winthrop Pulmonary Associates, P.C., Winthrop Radiology Associates, P.C., Winthrop Regional Health System Inc., Winthrop Surgical Associates, P.C., WSNCHS South, Inc., Council on Renal Nutrition of Long Island, Inc., Ladies Aid Society of the Wyckoff Heights Hospital Society of Brooklyn, Physicians' Wives Guild of Wyckoff Heights Hospital, Inc., Wyckoff Anesthesia Medical Services, P.C., Wyckoff Imaging Services, P.C., Wyckoff Medical Services, P.C., Wyckoff Neonatal Services, P.C., Wyckoff Orthopaedic, P.C., Wyckoff Surgical Services, P.C., The Wyckoff Heights Medical Center Foundation, Wyckoff Heights Dental Services, P.C., Wyckoff Heights Occupational Therapy, P.C., Brooklyn-Queen's Health Care, Inc., Stockholm Obstetrics & Gynecological Services, P.C., Amsterdam Continuing Care Health System, Inc., Amsterdam House CCRC, Inc., Amsterdam Services Corp., 2001, Amsterdam Consulting, LLC, Amsterdam Continuing Care Health System, Inc., Amsterdam Nursing Home Corporation,

the Silvercrest Senior Housing Development Fund Corp., Helen Hayes Hospital Foundation, Inc., the Volunteer Corps of The Helen Hayes Hospital, Inc., Rogosin Westchester LLC and Rogosin Auburndale, LLC (collectively, "Affiliates").

17.    Together the Named Defendants, the Health Centers and the Affiliates are referred to as "New York-Presbyterian Healthcare System" or "defendants."

18.    New York-Presbyterian Healthcare System is an enterprise engaged in the operation of a hospital and/or the care of the sick and is a healthcare consortium.

19.    Defendants operate over 260 health care facilities and centers and employ approximately 52,800 individuals.

20.    Defendants constitute an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

21.    For example, defendants have centralized supply chain management, and financial, computer, payroll and health records systems that are integrated throughout their locations.

22.    Further, defendants' labor relations and human resources are centrally organized and controlled, including defendants' employment of one Director of Operations as part of the management team, as well as the maintenance of system-wide policies and certain employee benefit plans.

23.    Defendants share common management, including oversight and management by a senior executive team and board of directors.

24.    Defendants have common ownership.

25.    At all relevant times, New York-Presbyterian Healthcare System has suffered or permitted Plaintiffs and Class Members to perform work for it at its various health care locations.

26.    Plaintiffs and Class Members are or have been employed by New York-Presbyterian Healthcare System and/or have been jointly employed by New York-Presbyterian Healthcare System.

27.    New York-Presbyterian Healthcare System operates locations, either directly or indirectly through the Health Centers and Affiliates, and therefore is the employer of Plaintiffs and Class Members who are or were employed at all locations.

28.    As such, defendants are the employer (single, joint or otherwise) of the Plaintiffs and Class Members and/or alter egos of each other.

29.    In light of the economic realities of the enterprise operated by New York-Presbyterian Healthcare System, New York-Presbyterian Healthcare System is a joint employer of Plaintiffs and Class Members.

30.    Collectively, New York-Presbyterian Healthcare System comprises a single, integrated enterprise, as they perform related activities through common control for a common business purpose.

31.    Defendants also engage in a joint venture for providing healthcare services by entering an agreement, established through their conduct in sharing the profits and losses.

32.    Defendants jointly managed and controlled this venture as well as its employees and assets.

33.    Defendants are jointly and severally liable to the class members for the damages arising out of this joint venture.

34.     Dr. Herbert Pardes is the President and CEO of New York-Presbyterian Healthcare System.

35.     Dr. Pardes's responsibilities include actively managing New York Presbyterian Healthcare System.

36.     In concert with others, Dr. Pardes has the authority to, and does, make decisions that concern the policies defendants adopt and the implementation of those policies.

37.     In concert with others, Dr. Pardes has the authority to, and does, make decisions that concern defendants' operations, including functions related to employment, human resources, training, payroll, and benefits.

38.     Due in part to his role as President, Dr. Pardes is actively involved in the creation of the illegal policies complained of in this case.

39.     Due in part to his role as President, Dr. Pardes actively advises defendants' agents on the enforcement of the illegal policies complained of in this case.

40.     Due in part to his role as President, Dr. Pardes actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

41.     In concert with others, Dr. Pardes has the authority to, and does, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiffs and Class Members.

42.     In concert with others, Dr. Pardes has the authority to, and does, make decisions that concern employees' schedules, hours and standard benefit levels.

43.    Dr. Pardes has the authority to, and does, make decisions that concern standard pay scales.

44.    Dr. Pardes has the authority to, and does, make decisions that concern defendants' human resources policies, the resolution of issues and disputes regarding policies and their applications, the counsel locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

45.    Dr. Pardes has the authority to, and does, make decisions that concern defendants' employment and human resources records, including the systems for keeping and maintaining those records.

46.    Dr. Pardes has the authority to, and does, make decisions that concern training and education functions across New York Presbyterian Healthcare System.

47.    Dr. Pardes has the authority to, and does, make decisions that concern the type and scope of training employees must attend as well as any compensation they receive for attending training.

48.    Dr. Pardes has the authority to, and does, make decisions that concern payroll functions across New York-Presbyterian Healthcare System.

49.    Dr. Pardes has the authority to, and does, make decisions that concern the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

50.    Dr. Pardes has the authority to, and does, make decisions that concern benefit plans across New York-Presbyterian Healthcare System.

51.     Dr. Pardes has the authority to, and does, make decisions that concern the type and scope of benefits available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

52.     Because Dr. Pardes has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of Plaintiffs and Class Members, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Dr. Pardes has the power to hire and fire employees.

53.     Because Dr. Pardes has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Dr. Pardes supervises and controls employees' work schedules and/or conditions of employment.

54.     Because Dr. Pardes has authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Dr. Pardes determines the rate and method of employees' payment.

55.     Because Dr. Pardes has authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for

keeping and maintaining payroll, benefits, and other employment-related records, Dr. Pardes maintains employees' employment records.

56.    Because Dr. Pardes provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he is affirmatively, directly, and actively involved in operations of the defendants' business functions, particularly in regards to the employment of Plaintiffs and Class Members.

57.    Because Dr. Pardes is actively involved in the creation of the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO, he actively participates in the violations complained of in this action.

58.    Based upon the foregoing, Dr. Pardes is liable to Plaintiffs and Class Members because of his active role in operating the business, his status as an employer, and/or according to federal law.

59.    Solomon A. Torres is the Director of Operations for New York-Presbyterian Healthcare System.

60.    Mr. Torres was responsible for, provides direction and control over, and was authorized to direct all aspects of human resources functions across New York-Presbyterian Healthcare System.

61.    Due in part to his role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Mr. Torres was actively involved

in the creation of the illegal policies complained of in this case.

62.    Due in part to his role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Mr. Torres actively advised defendants' agents on the enforcement of the illegal policies complained of in this case.

63.    Due in part to his role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Mr. Torres actively ensured defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

64.    Mr. Torres was actively involved in reviewing and counseling defendants regarding employment decisions, including hiring and firing of Plaintiffs and Class Members.

65.    Mr. Torres was actively involved in decisions that set employees' schedules, hours and standard benefit levels.

66.    Mr. Torres was actively involved in decisions that set standard pay scales.

67.    Mr. Torres was actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding policies and their application, the counseling locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

68.    Mr. Torres as actively involved in defendants' employment and human resources records, including the systems for keeping and maintaining those records.

69.    Mr. Torres as actively involved in training and education functions across New York-Presbyterian Healthcare System.

70.    Mr. Torres was actively involved in determining the type and scope of training employees must attend as well as any compensation they receive for attending training.

71.    Mr. Torres was actively involved in payroll functions across New York Presbyterian Healthcare System.

72.    Mr. Torres was actively involved in the system for keeping and maintaining employees' payroll records, the timing and method with which payment was conveyed to employees, and the manner and method in which employees receive payroll information, including their payroll checks.

73.    Mr. Torres was actively involved in benefit plans across New York Presbyterian Healthcare System.

74.    Mr. Torres was actively involved in determining the type and scope of benefits available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

75.    Because Mr. Torres had authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of employees, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Mr. Torres had the power to hire and fire employees.

76.    Because Mr. Torres had authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Mr. Torres supervised and controlled employees' work

-21-

schedules and/or conditions of employment.

77.    Because Mr. Torres had authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Mr. Torres determined the rate and method of employees' payment.

78.    Because Mr. Torres had authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Mr. Torres maintained employees' employment records.

79.    Because Mr. Torres provided day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he was affirmatively, directly, and actively involved in operations of defendants' business functions, particularly in regards to the employment of Plaintiffs and Class Members.

80.    Because Mr. Torres was actively involved in the creation of the illegal policies complained of in this case, actively advised defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensured defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO, Mr. Torres actively participated in the violations complained of in this action.

81.    Based upon the foregoing, Mr. Torres is liable to Plaintiffs and Class Members because of his active role in operating the business, his role in the violations complained of in this action, his status as an employer, and/or otherwise according to federal and state law.

B.    **Plaintiffs**

*Named Plaintiff*

82.    At all relevant times, Masahiro Nakahata ("Plaintiff") was an employee under the FLSA, employed within this District and resides within this District.

*Class Members*

83.    The Class Members are those employees of defendants who were suffered or permitted to work by defendants and not paid their regular or statutorily required rate of pay for all hours worked.

## FACTUAL BACKGROUND

84.    New York-Presbyterian Healthcare System is one of the largest health care providers in New York.

85.    As discussed below, defendants maintained several illegal pay policies that denied Plaintiffs and Class Members compensation for all hours worked, including applicable premium pay rates.

*Meal and Break Deduction Policy*

86.    Pursuant to defendants' "Meal and Break Deduction Policy," defendants' computerized timekeeping system automatically deducts time from employees' paychecks each day for meals, break and other reasons.

87.    Despite having this policy, defendants do not ensure that Plaintiffs and Class Members perform no work during the breaks.

88.    Plaintiffs and Class Members do in fact perform work during those breaks and are not paid for that time.

89.    Defendants know that the Plaintiffs and Class Members perform work during

-23-

these unpaid meals, breaks and other times, but still do not pay them for this time pursuant to their Meal and Break Deduction Policy.

90.    Defendants maintain the Meal and Break Deduction Policy throughout their facilities and centers.

91.    Plaintiffs and Class Members allow defendants to operate on a 24/7 basis, and in doing so, Plaintiffs and Class Members often perform compensable work for defendants during their uncompensated meal breaks.

92.    Defendants do not prohibit Plaintiffs and Class Members from working during their unpaid breaks and do not have rules against such work.

93.    Although defendants' policy deducts time each shift, defendants expect Plaintiffs and Class Members to be available to work throughout their shifts and consistently require their employees to work during their unpaid breaks.

94.    Plaintiffs and Class Members are not relieved by another employee when their break comes, or asked to leave their work location.

95.    Defendants know that Plaintiffs and Class Members perform work during their unpaid breaks.

96.    For example, Plaintiffs and Class Members perform work for the defendants, on defendants' premises, in plain sight, and at management's request.

97.    Defendants' management has repeatedly observed Plaintiffs and Class Members working though their unpaid breaks. Defendants' management has gone so far as to direct Plaintiffs and Class Members to work during their unpaid breaks even though defendants' management knew that they would not be able to have a full break.

98.    Plaintiffs and Class Members had conversations with defendants' managers in

which they discussed how they were working through their meals or other break time and were not getting paid for such work.

99.     When questioned by employees about the Meal and Break Deduction Policy, the defendants affirmatively stated that the employees were being fully paid for the work time for which they were entitled to be paid, even though defendants knew compensable work time was being excluded from the employees' pay. Such conversations occurred with Plaintiffs and Class Members on a number of occasions. These representations were part of a course of conduct (*see e.g.*, ¶¶ 113-117, 133-143) to defraud Plaintiffs and Class Members from the pay they were owed, and to mislead them into believing they had been fully paid as required by law.

100.     Further, given the demands of the health care industry and short staffing, defendants' management knew that to get the tasks done they assigned to Plaintiffs and Class Members, when they needed to get done, Plaintiffs and Class Members had to work through their breaks, even during times they were not paid for their meal or other break time.

101.     Even though defendants know their employees are performing such work, defendants fail to compensate their employees for such work.

102.     All Plaintiffs and Class Members are subject to the Meal and Break Deduction Policy and are not fully compensated for work they perform during breaks, including, without limitation, hourly employees working at New York-Presbyterian Healthcare System's facilities and centers, such as secretaries, housekeepers, custodians, clerks, porters, registered nurses, licensed practical nurses, transport nurses, nurse aides, administrative assistants, anesthetists, clinicians, medical coders, medical underwriters, nurse case managers, nurse interns, nurse practitioners, nurse aides, practice supervisors, professional staff nurses, quality coordinators,

resource pool nurses, respiratory therapists, senior research associates, operating room coordinators, surgical specialists, admissions officers, student nurse techs, trainers, transcriptionists, occupational therapists, occupational therapy assistants, physical therapists, physical therapy assistants, radiation therapists, staff therapists, angiotechnologists, x-ray technicians, CAT scan technicians, mammographers, MRI technologists, sleep technologists, surgical technologists, radiographers, phlebotomists, respiratory technicians, respiratory care specialists, respiratory care practitioners, clinical coordinators, medical assistants, home care nurses, home health aides, clinical case managers, midwives and other health care workers.

103.    Plaintiffs and Class Members are entitled to compensation for all time they performed work for defendants, including during their unpaid breaks.

104.    In addition, if Plaintiffs' and Class Members' hours had been properly calculated, the time spent working during unpaid breaks often would include work that should have been calculated at applicable premium pay rates.

105.    Plaintiffs and Class Members subject to the Meal and Break Deduction Policy are members of Subclass .

### Unpaid Preliminary and Postliminary Work Policy

106.    Defendants suffered or permitted Plaintiffs and Class Members to perform work before and/or after the end of their scheduled shifts.

107.    However, defendants failed to pay Plaintiffs and Class Members for all time spent performing such work as a result of defendants' policies, practices and/or time recording system (the "Unpaid Preliminary and Postliminary Work Policy").

108.    In addition, if Plaintiffs' and Class Members' hours had been properly calculated, the time spent performing work before and/or after their shifts often would have

included work that should have been calculated at applicable premium pay rates.

109.    Plaintiffs and Class Members subject to the Unpaid Preliminary and Postliminary Work Policy are members of Subclass 2.

*Additional Allegations*

110.    Plaintiffs and Class Members were subject to defendants' timekeeping policies which fail to ensure that employees are compensated for all hours worked, including pursuant to the Unpaid Work Policies.

111.    Even though New York-Presbyterian Healthcare System knows its employees are performing such work, New York-Presbyterian Healthcare System fails to compensate its employees for such work.

112.    Defendants' practice is to be deliberately indifferent to these violations of the statutory wage and overtime requirements.

113.    Through the paystubs and payroll information it provided to employees, New York-Presbyterian Healthcare System deliberately concealed from its employees that they did not receive compensation for all compensable work that they performed and misled them into believing they were being paid properly.

114.    Further, by maintaining and propagating the illegal Unpaid Work Policies, defendants deliberately misrepresented to Plaintiffs and Class Members that they were being properly paid for all compensable time, even though Plaintiffs and Class Members were not receiving pay for all time worked including applicable premium pay.

115.    The defendants engaged in such conduct and made such statements to conceal from the Plaintiffs and Class Members their rights and to frustrate the vindication of the employees' federal rights.

-27-

116.    As a result, employees were unaware of their claims.

117.    Defendants' failure to pay overtime as required by the FLSA is willful.

118.    Defendants, however, at all times, intended to violate applicable federal laws by failing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay for all hours worked including applicable premium pay.

119.    Among the relief sought, Plaintiffs and Class Members seek injunctive relief to prevent defendants from continuing the illegal policies and practices perpetuated pursuant to the Unpaid Work Policies.

120.    Defendants failed to keep accurate records of all time worked by Plaintiffs and Class Members.

121.    As used in this Complaint, "mailed" means: (1) placing in any post office or authorized depository for mailed matter, any matter or thing to be delivered by the United States Postal Service; (2) causing to be deposited any matter or thing to be delivered by any private or commercial interstate carrier; (3) taking or receiving therefrom any such matter or thing; and/or (4) knowingly causing to be delivered by any such means any such matter.

122.    Plaintiffs and Class Members allege that defendants devised, intended to devise, and carried out a scheme to cheat Plaintiffs and Class Members out of their property and to convert Plaintiffs and Class Members' property, including their wages and/or overtime pay (the "Scheme"). Defendants' Scheme consisted of illegally, willfully and systematically withholding or refusing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay for all hours worked in violation of federal law, as described previously in this Complaint.

123.    Defendants' Scheme involved the employment of material misrepresentations

and/or omissions and other deceptive practices reasonably calculated to deceive Plaintiffs and Class Members. The Scheme involved depriving Plaintiffs and Class Members of their lawful entitlement to wages and overtime.

124.    In executing or attempting to execute the Scheme and to receive the financial benefits of the Scheme, defendants repeatedly mailed payroll checks, either directly to Plaintiffs and Class Members or between defendants' business locations. These mailings occurred on a regular basis and more than 100 such mailings occurred in the last 10 years.

125.    The payroll checks were false and deceptive because they misled Plaintiffs and Class Members about the amount of wages to which they were entitled, and whether defendants had included all compensable work time, as well as their status and rights under the FLSA. Plaintiffs and Class Members relied to their detriment on the misleading payroll checks that defendants mailed and those misleading documents were a proximate cause of Plaintiffs and Class Members' injuries.

126.    Defendants' predicate acts of mailing the misleading payroll checks in furtherance of their Scheme constitute a pattern of conduct unlawful pursuant to 18 U.S.C. § 1961(5) based upon both the relationship between the acts and continuity over the period of time of the acts. The relationship was reflected because the acts were connected to each other in furtherance of the Scheme. Continuity was reflected by both the repeated nature of the mailings during and in furtherance of the Scheme and the threat of similar acts occurring in the future. The threat was reflected by the continuing and ongoing nature of the acts.

127.    Defendants' predicate acts were related, because they reflected the same purpose or goal (to retain wages and overtime pay due to Plaintiffs and Class Members for the economic benefit of defendants and members of the enterprise); results (retention of

wages and overtime pay); participants (defendants and other members of the enterprise); victims (Plaintiffs and Class Members); and methods of commission (the Scheme and other acts described in the Complaint). The acts were interrelated and not isolated events, since they were carried out for the same purposes in a continuous manner over a substantial period of time.

128.    At all relevant times, in connection with the Scheme, defendants acted with malice, intent, knowledge, and in reckless disregard of Plaintiffs and Class Members' rights.

129.    Each of the Plaintiffs and Class Members is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

130.    Each defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

131.    Defendants were members of an "enterprise" under 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in or the activities of which affected interstate and foreign commerce.

132.    Each defendant received income from a pattern of conduct unlawful under RICO, in which defendants participated through continuous instances of providing Plaintiffs and Class Members with misleading documents which defendants mailed and upon which Plaintiffs and Class Members relied to their detriment.

133.    Plaintiffs and Class Members were injured in their business and property under 18 U.S.C. § 1964(c) by reason of defendants' commission of conduct which was unlawful under RICO.

134.    Every wage payment that the defendants mailed to the Plaintiffs and Class Members as part of the Scheme constituted a new legal injury to the Plaintiffs and Class

Members.

135.    Therefore, each and every improper payment within the relevant statute of limitations period constitutes a new legal injury and the Plaintiffs and Class Members are entitled to recover based on the reduction in each improper payment.

136.    Additionally, as set forth in the allegations above, including ¶¶ 99, 113-117, the defendants fraudulently concealed from the Plaintiffs and Class Members the facts that are the basis for their claims. Further, such conduct by the defendants equitably tolls the statute of limitations covering Plaintiffs and Class Members' claims.

137.    Because of such conduct, the Plaintiffs and Class Members did not discover in the relevant statute of limitations period that the defendants were not paying them properly.

138.    The Plaintiffs and Class Members exercised due diligence, but still were unaware of their rights.

139.    The Plaintiffs and Class Members are not experts in proper payment under federal labor laws, and more specifically are not aware of what time is compensable for interrupted and missed meal breaks, nor how the defendants' internal computer systems were determining the amount they were being paid.

140.    Further, when questioned, the defendants falsely assured Plaintiffs and Class Members that the defendants understood federal and state labor laws and that based on that knowledge, the defendants were ensuring that they were properly paying the Plaintiffs and Class Members.

141.    The defendants made this representation despite the fact that such claims were false, fully knowing that Plaintiffs and Class Members were relying on the defendants' "expertise" and assurances.

142.    Further, these assurances were not contradicted by the information in legal postings required by state or federal law to be displayed prominently at places of work to which Plaintiffs and Class Members had access.

143.    Prior to seeking legal advice from Class Counsel, the Plaintiffs were never alerted to the defendants' concealment of their violation of the law by failing to pay the Plaintiffs and Class Members properly.

144.    Further, not until the commencement of this action were Class Members made aware that the defendants' conduct in fact violated the law.

145.    Plaintiffs and Class Members were not classified as exempt employees because hourly employees do not fall under one of the enumerated exemptions under the FLSA.

## FIRST CAUSE OF ACTION
### *FLSA*

146.    Plaintiffs and Class Members reallege the above paragraphs as if fully restated herein.

147.    Defendants willfully violated their obligations under the FLSA and are liable to Plaintiffs and Class Members.

## SECOND CAUSE OF ACTION
### *RICO*

148.    Plaintiffs and Class Members reallege the above paragraphs as if fully restated herein.

149.    Plaintiffs and Class Members bring these claims under 18 U.S.C. § 1964(c), which confers on private individuals the right to bring suit for any injury caused by a violation of 18 U.S.C. § 1962.

150.    Defendants' conduct, and the conduct of other members of the enterprise,

injured Plaintiffs and Class Members by refusing to pay their regular or statutorily required rate of pay for all hours worked. Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, by devising a Scheme to obtain Plaintiffs' and Class Members' property by means of false or fraudulent representations, at least some of which were made in the misleading payroll checks which defendants mailed.

**WHEREFORE**, Plaintiffs and Class Members demand judgment against defendants in their favor and that they be given the following relief:

(a)    an order preliminarily and permanently restraining defendants from engaging in the aforementioned pay violations;

(b)    an award crediting Plaintiffs and Class Members for all hours worked;

(c)    an award of the value of Plaintiffs' and Class Members' unpaid wages;

(d)    liquidated damages under the FLSA equal to the sum of the amount of wages and overtime which were not properly paid to Plaintiffs and Class Members;

(e)    an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Plaintiffs' and Class Members' rights;

(f)    an award of pre- and post-judgment interest; and

(g)    such other and further legal or equitable relief as this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: March 24, 2010

THOMAS & SOLOMON LLP

By: _____
Justin M. Cordello, Esq.
*Attorneys for Plaintiff and Class Members*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
jcordello@theemploymentattorneys.com